IN THE CIRCUIT COURT FOR CALVERT COUNTY, MARYLAND

| | |
|---|---|
| **JULIE LARSON, as Personal Representative of the ESTATE OF JOHN LARSON, and in her Individual Capacity,**<br>**11409 Baumann Court**<br>**Dunkirk, Maryland 20754**<br><br>    **Plaintiff**<br><br>**v.**<br><br>**PERMOBIL, INC.**<br>**300 Duke Drive**<br>**Lebanon, Tennessee 37090**<br><br>  **Serve On: Resident Agent**<br>  **The Corporation Trust Inc.**<br>  **2405 York Road, Suite 201**<br>  **Timonium, Maryland 21093**<br><br>**and**<br><br>**STEALTH PRODUCTS, INC.**<br>**104 John Kelly Drive**<br>**Burnet, Texas 78611**<br><br>  **Serve On: President**<br>  **Lorenzo Romero**<br>  **104 John Kelly Drive**<br>  **Burnet, Texas 78611**<br><br>**and**<br><br>**PRIDE MOBILITY PRODUCTS CORP. d/b/a QUANTUM REHAB**<br>**401 York Avenue**<br>**Duryea, Pennsylvania 18642**<br><br>  **Serve On: President**<br>  **Pauline Shenton**<br>  **401 York Avenue**<br>  **Duryea, Pennsylvania 18642** | Case No. C-04-CV-22-000510 |

**and**

**ROTEC HEALTHCARE INC. f/n/a
and d/b/a MED, INC.
3600 Vineland Road, Suite 114
Orlando, Florida 32811**

  **Serve On: Resident Agent
  Natl. Registered Agents, Inc. of MD
  2405 York Road, Suite 300
  Baltimore, Maryland 21093**

**and**

**UNITED SEATING AND MOBILITY,
LLC d/b/a NUMOTION
1111 Cromwell Avenue, suite 601
Rocky Hill, CT 06067**

  **Serve On: Resident Agent
  Registered Agents Inc.
  500 Thayer Center, Suite C
  Oakland, Maryland 21550**

    **Defendants**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, by and through her attorneys, Gregory G. Hopper and Bekman, Marder, Hopper, Malarkey & Perlin, LLC, hereby sues Defendants, Permobil, Inc., Stealth Products, Inc., Pride Mobility Products Corporation d/b/a Quantum Rehab, Rotec Healthcare Inc. f/n/a and d/b/a Med Inc., United Seating and Mobility LLC d/b/a Numotion, and demands a jury trial on all of the counts alleged against them. In support thereof, Plaintiff alleges and avers as follows:

## Nature of Action

1.      This is a products liability and negligence claim brought by Julie Larson on behalf of her deceased husband, John Larson. On September 4, 2019, Mr. Larson, who was a quadriplegic, was operating a power wheelchair up a ramp by moving his head toward and away from proximity sensors mounted to a head array. It was hot outside and sweat from Mr. Larson's head transferred to the fabric covering one of the proximity sensors. As Mr. Larson got to the top of the ramp, he moved his head away from the original sensor and toward another to turn the wheelchair to the right, but the chair did not turn. Instead, the wheelchair continued moving as if Mr. Larson's head was in its original position. Mr. Larson tried to turn the wheelchair again, but it was unresponsive. He tried to stop the wheelchair, but before he could it drove off the edge of the elevated platform with him inside. Mr. Larson struck the ground and the wheelchair landed on top of him, causing him to suffer serious injury including multiple fractures.

2.      Julie Larson, Mr. Larson's wife and Personal Representative, is suing the companies who designed, manufactured, distributed, sold, maintained, and provided other services related to the wheelchair, head array, and proximity sensors: Permobil, Stealth Products, Pride/Quantum Rehab, Rotech Healthcare f/n/a and d/b/a Med Inc., and United Seating/Numotion. She seeks compensation from these companies for causing Mr. Larson's injuries and pain and suffering.

**Parties**

3.     At all times relevant to this cause of action, John and Julie Larson were resident and citizens of the State of Maryland, were married to each other, and lived as husband and wife at 11409 Baumann Court in Dunkirk, Maryland. Prior to the filing of this Complaint, Mr. Larson died. Mrs. Larson opened an estate on Mr. Larson's behalf and was appointed to serve as Personal Representative. Mrs. Larson is a resident and citizen of the State of Maryland.

4.     Defendant, Permobil, Inc., is a corporation organized and existing under the laws of the State of Tennessee, but it has a significant and enduring relationship with the State of Maryland and has made a purposeful and intentional decision to avail itself of the laws, protections, and benefits of doing business here. Permobil has territorial sales managers, regional clinical managers, and other actual and apparent agents, servants, and employees who regularly work and conduct business in Maryland. Permobil also has a dealer network that operates in Maryland. As such, Permobil regularly does and solicits business, engages in a persistent course of conduct, derives substantial revenue from goods used and consumed, renders services, and transacts business in the State of Maryland. It has ongoing and significant contracts with hospitals and other providers in the State of Maryland. Permobil employs sales representatives and other agents who target and intentionally seek out business in the State of Maryland. It regularly communicates with businesses who sell, inspect, and maintain its products in the State of Maryland. It regularly communicates with consumers and owners of its products regarding the use, maintenance, repair, and warranties on its products in the State of Maryland. It regularly communicates and attempts to directly sell products and services with current, former, and potential

customers in the State of Maryland. It regularly does and solicits business, engages in a persistent course of conduct, and derives substantial revenue from goods and manufactured products used in the State of Maryland. It serves a market for its powered wheelchairs, head arrays, and proximity sensors in the State of Maryland, including the product or products that caused harm to John Larson, a resident and citizen of the State of Maryland, in the State of Maryland. And, as outlined in more detail below, some of the acts and omissions of Permobil and its actual and apparent agents, servants, and employees in this case occurred in the State of Maryland. All of this amounts to a purposeful and intentional decision to avail itself of the laws, protections, and benefits in this jurisdiction.

5.     Defendant, Stealth Products, Inc., is a corporation organized and existing under the laws of the State of Texas with a principal place of business located in Texas. Stealth regularly does and solicits business, engages in a persistent course of conduct, derives substantial revenue from goods used and consumed, renders services, and transacts business in the State of Maryland. It has ongoing and significant contracts health care providers in the State of Maryland. Stealth employs sales representatives and other agents who target and intentionally seek out business in the State of Maryland. It regularly communicates with businesses who sell, inspect, and maintain its products in the State of Maryland It regularly communicates with consumers and owners of its products regarding the use, maintenance, repair, and warranties on its products in the State of Maryland. It regularly communicates and attempts to directly sell products and services with current, former, and potential customers in the State of Maryland. It regularly does and solicits business, engages in a persistent course of conduct, and derives substantial revenue from goods and manufactured products used in the State of Maryland. It serves a market for its

powered wheelchairs, head arrays, and proximity sensors in the State of Maryland, including the product or products that caused harm to John Larson, a resident and citizen of the State of Maryland, in the State of Maryland. And, as outlined in more detail below, the acts and omissions of Stealth and its actual and apparent agents, servants, and employees in this case occurred in the State of Maryland. This amounts to a purposeful and intentional decision to avail itself of the laws, protections, and benefits in this jurisdiction.

6.      Defendant, Pride Mobility Products Corporation, is a corporation organized and existing under the laws of the State of Missouri with a principal place of business located in Pennsylvania. It does business under its own name and as Quantum Rehab. Pride/Quantum Rehab regularly does and solicits business, engages in a persistent course of conduct, derives substantial revenue from goods used and consumed, renders services, and transacts business in the State of Maryland. It has ongoing and significant contracts with the hospitals and other providers in the State of Maryland. Pride/Quantum Rehab employs sales representatives and other agents who target and intentionally seek out business in the State of Maryland. It regularly communicates with businesses who sell, inspect, and maintain its products in the State of Maryland. It regularly communicates with consumers and owners of its products regarding the use, maintenance, repair, and warranties on its products in the State of Maryland. It regularly communicates and attempts to directly sell products and services with current, former, and potential customers in the State of Maryland. It regularly does and solicits business, engages in a persistent course of conduct, and derives substantial revenue from goods and manufactured products used in the State of Maryland. It serves a market for its powered wheelchairs, head arrays, and proximity sensors in the State of Maryland, including the product or products that caused

harm to John Larson, a resident and citizen of the State of Maryland, in the State of Maryland. And, as outlined in more detail below, the acts and omissions of Pride/Quantum Rehab and its actual and apparent agents, servants, and employees in this case occurred in the State of Maryland. This amounts to a purposeful and intentional decision to avail itself of the laws, protections, and benefits in this jurisdiction.

7. Defendant, Rotech Healthcare Inc., is corporation organized and existing under the laws of the State of Delaware with a principal place of business located in Florida. Med Inc. Rotech purchased the assets and liabilities of Med. Inc., a Virginia company, in 2000. Rotech, doing business as "Med Inc." and on its own, regularly does and solicits business, engages in a persistent course of conduct, derives substantial revenue from goods used and consumed, renders services, and transacts business in the State of Maryland. It has ongoing and significant contracts with hospitals and other medical providers in the State of Maryland. It employs sales representatives and other agents who target and intentionally seek out business in the State of Maryland. It regularly communicates with businesses who sell, inspect, and maintain its products in the State of Maryland. It regularly communicates with consumers and owners of its products regarding the use, maintenance, repair, and warranties on its products in the State of Maryland. It regularly communicates and attempts to directly sell products and services with current, former, and potential customers in the State of Maryland. It regularly does and solicits business, engages in a persistent course of conduct, and derives substantial revenue from goods and manufactured products used in the State of Maryland. It serves a market for its powered wheelchairs, head arrays, and proximity sensors in the State of Maryland, including the product or products that caused harm to John Larson, a resident and citizen of the State of Maryland,

in the State of Maryland. And, as outlined in more detail below, some, if not all, of the acts and omissions of Rotech and/or Med Inc. and its actual and apparent agents, servants, and employees in this case occurred in the State of Maryland. All of this amounts to a purposeful and intentional decision to avail itself of the laws, protections, and benefits in this jurisdiction.

     8.    Defendant, United Seating and Mobility LLC, is a corporation organized and existing under the laws of the State of Connecticut with a principal place of business located in Connecticut. It does business under its own name and as Numotion. United Seating/Numotion regularly does and solicits business, engages in a persistent course of conduct, derives substantial revenue from goods used and consumed, renders services, and transacts business in the State of Maryland. It has ongoing and significant contracts with hospitals and other health care providers in the State of Maryland. United Seating/Numotion employs sales representatives and other agents who target and intentionally seek out business in the State of Maryland. It regularly communicates with businesses who sell, inspect, and maintain its products in the State of Maryland. It regularly communicates with consumers and owners of its products regarding the use, maintenance, repair, and warranties on its products in the State of Maryland. It regularly communicates and attempts to directly sell products and services with current, former, and potential customers in the State of Maryland. It regularly does and solicits business, engages in a persistent course of conduct, and derives substantial revenue from goods and manufactured products used in the State of Maryland. It serves a market for its powered wheelchairs, head arrays, and proximity sensors in the State of Maryland, including the product or products that caused harm to John Larson, a resident and citizen of the State of Maryland,

in the State of Maryland. And, as outlined in more detail below, the acts and omissions of United Seating/Numotion and its actual and apparent agents, servants, and employees in this case occurred in the State of Maryland. This amounts to a purposeful and intentional decision to avail itself of the laws, protections, and benefits in this jurisdiction.

### Jurisdiction and Venue

9.      The damages in this case exceed $75,000 (Seventy-Five Thousand Dollars) and jurisdiction rests exclusively in the Circuit Court. Venue is proper in Calvert County because it is where the injury occurred due to Defendants' actions.

10.      This court has personal jurisdiction over Defendants, Permobil, Stealth Products, Pride/Quantum Rehab, Rotech Healthcare f/n/a and d/b/a Med Inc., and United Seating/Numotion, pursuant to § 6-103(b). Additionally, Defendants sold and serviced the power wheelchair, head array, sensors, and other components at issue in this case in the State of Maryland, rendering them subject to the Court's jurisdiction through the Maryland Long Arm Statute.

### Factual Allegations

11.      John Larson suffered a brain stem stroke leaving him a quadriplegic in 2014.

12.      Mr. Larson was admitted to the National Rehabilitation Hospital in Washington D.C. in September 2014. The providers there evaluated Mr. Larson for a wheelchair; spoke to the representatives of Permobil, Stealth Products, Pride Mobility/Quantum Rehab, Rotech/Med Inc., and United Seating/Numotion about the available products; and recommended that Mr. and Mrs. Larson purchase a Permobil power wheelchair controlled by proximity sensors mounted to a head array. Mr. and Mrs. Larson

agreed and purchased the equipment, which was delivered to their home in Maryland in April 2015.

13.     Defendants' actual and apparent agents, servants, and employees, individually and/or in collaboration with one another, told Mr. and Mrs. Larson, expressly and impliedly, that Permobil power wheelchairs and the proposed head array, sensors, and other components were well-designed, safe, and state-of-the-art; they would allow Mr. Larson to safely move and stop under his own control; they were appropriate for all of the conditions and environments Mr. Larson would encounter; and they were free from any latent defects, dangers, or hazards.

14.     Mr. and Mrs. Larson did not have any experience with power wheelchairs, head arrays, proximity sensors, and other such equipment. Based on their communications and written material from the Defendants, Mr. and Mrs. Larson believed that the Defendants were in the best position to understand the capabilities, limitations, risks, and benefits of the equipment and that they would train and instruct Mr. Larson on how to safely and properly use the equipment. Mr. and Mrs. Larson agreed to purchase the equipment based on the Defendants' communications and materials.

15.     The wheelchair was designed, developed, manufactured, distributed, and sold by Permobil, who was serving a market segment in Maryland.

16.     To the best of Plaintiff's knowledge, the head array and sensors were designed, packaged, assembled, manufactured, distributed, and sold by Permobil, Stealth, and/or Pride/Quantum Rehab, who were serving a market segment in Maryland.

17.     The wheelchair, head array, and sensors were distributed and sold through Med Inc. and it had the initial contract to inspect, service, and repair the equipment. This meant that it performed work on the equipment in Maryland.

18.     United Seating/Numotion took over contractual responsibility for inspecting, servicing, and repairing the equipment after several months. This meant that it performed work on the equipment in Maryland.

19.     Rotech/Med. Inc. delivered the wheelchair and equipment and periodically inspected, serviced, and replaced components. United Seating/Numotion then took over responsibility for the inspection, service, and repair of the wheelchair.

20.     During this time (while both Rotech/Med Inc. and United Seating/Numotion had service contracts), the Larsons noticed that the wheelchair at issue would occasionally move unexpectedly. On one or more occasions, the wheelchair turned without Mr. Larson moving his head or became briefly unresponsive. Mrs. Larson raised this issue with the service technicians Med. Inc. and United Seating/Numotion sent to inspect and service the equipment. With Mrs. Larson present or nearby, the representatives called and spoke with Sherry Mumma, a staff member at National Rehabilitation Hospital/Medstar Health, and representatives of Permobil, Stealth Products, and/or Pride/Quantum Rehab.

21.     The Larsons, who were in Maryland, were told that there was nothing to worry about and there must have been a mistake because the wheelchair could not move on its own.

22.     The Larsons relied upon their explanations.

23.     Mr. and Mrs. Larson were never told that if Mr. Larson was sweating or had moisture or product in his hair that it could get on the head array and/or the head array fabric and cause the proximity sensors to mistakenly register his head as being present and cause the wheelchair to unintentionally move on its own or become unresponsive. He had no reason to believe he was in any danger of being injured.

24.     Mr. and Mrs. Larson remained in contact with the Defendants' representatives. The wheelchair and its components were regularly inspected and serviced. And the Defendants communicated with the Larsons and each other as issues arose.

25.     On September 4, 2019, Mr. Larson attempted to go up a ramp at his house in the Permobil power wheelchair. It was warm outside and he was sweating and his face and hair were moist. Sweat or moisture from Mr. Larson's face or hair got onto the fabric surrounding the proximity sensor.

26.     As Mr. Larson got to the top of the ramp, he moved his head away from the original sensor and toward another to turn the wheelchair to the right, but the chair did not turn. Instead, the wheelchair continued moving in the direction controlled by the original sensor. Mr. Larson tried to turn the wheelchair again, but it was unresponsive.

27.     Mr. Larson tried to stop the wheelchair, but before he could it drove off the edge of the elevated platform with him inside. Mr. Larson struck the ground and the wheelchair landed on top of him.

28.     As a result of the malfunction, Mr. Larson suffered a right tibia and fibula fracture, a right supracondylar femur fracture, abdominal and internal damage, and other injuries, harms, and damages. He was also frightened and upset by what happened. Though

his paralysis limited some of the physical effects of the injuries, he experienced physical, emotional, and economic losses.

29.     After the occurrence, Mrs. Larson contacted Sherry Mumma and told her what happened.

30.     Ms. Mumma contacted representatives from the other Defendants to see if they were aware of any prior problems or incidents involving wheelchairs misinterpreting moisture as head proximity and moving on their own volition or becoming unresponsive.

31.     Ms. Mumma was initially told that the other Defendants were not aware of this risk, but after further communications with representatives, they admitted that they knew about it before the occurrence.

**Count 1 – Consumer Protection Act Violation**
**Permobil**

32.     Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, hereby adopts and incorporates by reference paragraphs 1 through 31 as though they were fully and completely set forth herein.

33.     The State of Maryland has enacted a consumer protection statute establishing an enforceable right to truthful information from merchants about consumer goods and services and provide a remedy to all improper, unfair, and deceptive trade practices.

34.     At all times relevant to this cause of action, Defendant, Permobil, Inc., was a merchant, person, provider, and seller of goods and services within the definitions and under the Maryland consumer protection statute. Permobil was the designer, assembler, manufacturer, distributor, and seller of the wheelchair, head array, and/or sensors at issue and provided brochures, manuals, instructions, and other documents containing

representations about its product and the services it rendered and/or was capable of rendering. It also made its actual and apparent agents, servants, and employees available to users, customers, and providers as a service to assist with potential problems and issues with mobility equipment including wheelchairs, head arrays, and sensors used in head arrays, including the Larsons.

35. Under the Maryland statute, Permobil and its actual and apparent agents, servants, and employees, were prohibited from representing that goods and services have characteristics, uses, benefits, or qualities that they did not have; representing that goods or services were of a particular standard, quality, grade, style or model despite being another; misrepresenting material facts which had a tendency to mislead; and failing to state material facts when not stating them had a tendency to mislead.

36. Permobil, directly and by and through its actual and apparent agents, servants, and employees, engaged in unfair or deceptive trade practices and violated the Maryland consumer protection statute in the following ways.

    a.    They misrepresented one or more material facts about the wheelchair, head array, and sensors at issue and/or their services which had a tendency to, and did, mislead the Larsons in violation of § 13-301, *et seq*., of the Annotated Code of Maryland. Specifically, they:

        (1)    misrepresented to the Larsons, directly and by implication, that the wheelchair, head array, sensors, and other components were safe to use without limitations based on the level of heat, humidity, or moisture present;

        (2)    misrepresented to the Larsons, directly and by implication, that the user of the wheelchair (in this case, Mr. Larson) did not need to take any precautions when using the wheelchair in hot, humid, or moist conditions;

    (3)       misrepresented to the Larsons, directly and by implication, that the user of the wheelchair (in this case, Mr. Larson) could stop the wheelchair even if it malfunctioned;

    (4)       misrepresented to the Larsons, directly and by implication, that the wheelchair could not move on its own, there was no explanation for the Larsons' observations, and/or the Larsons must have been mistaken;

    (5)       misrepresented to the Larsons, directly and by implication, that the wheelchair, head array, and sensors did not have latent defects, dangers, or hazards that made it unreasonably dangerous;

    (6)       misrepresented to the Larsons, directly and by implication, that they were experts in the field of wheelchair safety, use, and operation;

    (7)       misrepresented to the Larsons, directly and by implication, that they were fully informed about all of the capabilities, limitations, and risks involved in using the wheelchair, head array, and sensors;

    (8)       misrepresented to the Larsons, directly and by implication, that they had been trained by the manufacturers of the wheelchair, head array, and sensors about all of the capabilities, limitations, and risks involved in using the equipment;

    (9)       misrepresented to the Larsons, directly and by implication, that they had informed the Larsons about all of the warnings and instructions provided by the manufacturers or the wheelchair, head array, and sensors;

    (10)     misrepresented to the Larsons, directly and by implication, that Mr. Larson would be able to operate the wheelchair safely if he followed the instructions and warnings they had given him;

    (11)     misrepresented to the Larsons, directly and by implication, that they had spoken to representatives of the manufacturers of the wheelchair, head array, and sensors to determine what was causing the wheelchair to behave oddly;

    (12)     misrepresented to the Larsons, directly and by implication, that they would act as a go-between with the manufacturers

of the wheelchair, head array, and sensors to determine what was causing the wheelchair to behave oddly;

(13)    misrepresented to the Larsons, directly and by implication, that they would act as a fiduciary to them; and

(14)    misrepresented to the Larsons, directly and by implication, that they had sufficient training and/or knowledge about the wheelchair, head array, and sensors to adequately train Mr. Larson to safely use the equipment.

b.    They failed to state one or more material facts about the about the wheelchair, head array, and sensors at issue and/or their services which had a tendency to, and did, mislead the Larsons in violation of § 13-301, *et seq*., of the Annotated Code of Maryland. Specifically, they:

(1)    failed to state that the wheelchair, head array, sensors, and other components could malfunction if sweat, hair products, or other moisture was transferred to the head array fabric in front of the sensor;

(2)    failed to state that if the wheelchair, head array, sensors, and other components malfunctioned, it could cause the wheelchair to unexpectedly and inadvertently move and/or become nonresponsive;

(3)    failed to state that if the wheelchair unexpectedly and inadvertently moved and/or become nonresponsive, it could cause the user (in this case, Mr. Larson) to suffer serious bodily injury;

(4)    failed to state that there was research indicating and/or prior incidents in which a wheelchair malfunctioned due to sweat, hair products, or other moisture that caused the wheelchair to unexpectedly and inadvertently move and/or become nonresponsive, putting its user at risk of injury;

(5)    failed to state to the Larsons, directly and by implication, that the wheelchair, head array, sensors, and other components were unsafe to use without taking precautions based on the level of heat, humidity, or moisture present;

(6)    failed to state to the Larsons, directly and by implication, that Mr. Larson needed to take precautions for his own safety

when using the wheelchair in hot, humid, or moist conditions;

(7)     failed to state to the Larsons, directly and by implication, that Mrs. Larson needed to take precautions for Mr. Larson's safety when he was using the wheelchair in hot, humid, or moist conditions;

(8)     failed to state to the Larsons, directly and by implication, that Mr. Larson would likely not be able to stop the wheelchair if it malfunctioned;

(9)     failed to state to the Larsons, directly and by implication, that the wheelchair could move on its own if it was malfunctioning due to sweat, hair products, or moisture transferring to the head array and fooling the sensor into believing that Mr. Larson was present when he was not;

(10)    failed to state to the Larsons, directly and by implication, that the wheelchair, head array, and/or sensors had latent defects, dangers, or hazards that made them/it unreasonably dangerous; and

(11)    failed to state to the Larsons, directly and by implication, that they were not experts in the field of wheelchair safety, use, and operation;

(12)    failed to state to the Larsons, directly and by implication, that they were not fully informed about all of the capabilities, limitations, and risks involved in using the wheelchair, head array, and sensors;

(13)    failed to state to the Larsons, directly and by implication, that they had not been trained by the manufacturers of the wheelchair, head array, and sensors about all of the capabilities, limitations, and risks involved in using the equipment;

(14)    failed to state to the Larsons, directly and by implication, that they had not informed the Larsons about all of the warnings and instructions provided by the manufacturers or the wheelchair, head array, and sensors;

(15)    failed to state to the Larsons, directly and by implication, that they had not spoken to representatives of the manufacturers

of the wheelchair, head array, and sensors to determine what was causing the wheelchair to behave oddly;

(16)    failed to state to the Larsons, directly and by implication, that they would not act as a go-between with the manufacturers of the wheelchair, head array, and sensors to determine what was causing the wheelchair to behave oddly;

(17)    failed to state to the Larsons, directly and by implication, that they would not act as a fiduciary to them;

(18)    failed to state to the Larsons, directly and by implication, that they had insufficient training and/or knowledge about the wheelchair, head array, and sensors to adequately train Mr. Larson to safely use the equipment.

(19)    failed to state to the Larsons, directly and by implication, that they did not know whether the wheelchair, head array, sensors, and other components were unsafe to use without taking precautions based on the level of heat, humidity, or moisture present;

(20)    failed to state to the Larsons, directly and by implication, that they did not know whether Mr. Larson needed to take precautions for his own safety when using the wheelchair in hot, humid, or moist conditions;

(21)    failed to state to the Larsons, directly and by implication, that they did not know whether Mrs. Larson needed to take precautions for Mr. Larson's safety when he was using the wheelchair in hot, humid, or moist conditions;

(22)    failed to state to the Larsons, directly and by implication, that they did not know whether Mr. Larson would likely not be able to stop the wheelchair if it malfunctioned;

(23)    failed to state to the Larsons, directly and by implication, that they did not know whether the wheelchair could move on its own if it was malfunctioning due to sweat, hair products, or moisture transferring to the head array and fooling the sensor into believing that Mr. Larson was present when he was not; and

(24)    failed to state to the Larsons, directly and by implication, that they did not know whether the wheelchair, head array,

and/or sensors had latent defects, dangers, or hazards that
made them/it unreasonably dangerous.

37.     As a direct and proximate result of these unfair and deceptive trade
practices, misrepresentations, and/or failures to state material facts, Mr. Larson suffered
serious, painful, permanent, and disabling bodily injury, physical pain, mental and
emotional anguish, emotional trauma, disfigurement, humiliation, inconvenience, physical
impairment, and other related injuries. Additionally, Mr. Larson suffered significant
economic damages and losses including, but not limited to, medical and other expenses
and other related harms.

WHEREFORE, Plaintiff, Julie Larson, as Personal Representative of the Estate of
John Larson, claims damages against Defendant, Permobil, Inc., in the amount of three
million dollars ($3,000,000) plus interest and all costs of this action.

## Count 2 – Negligence
### Permobil

38.     Plaintiff, Julie Larson, as Personal Representative of the Estate of John
Larson, hereby adopts and incorporates by reference paragraphs 1 through 31 as though
they were fully and completely set forth herein.

39.     Defendant, Permobil, Inc., was the designer, assembler, manufacturer,
distributor, and/or seller of the wheelchair, head array, and/or sensors at issue in this case.
It communicated with hospitals, medical supply companies, medical device service
companies, users, and users' families about the capabilities, limitations, and risks
associated with using its products. It made its representatives available to hospitals,
medical supply companies, medical device service companies, users, and users' families
to discuss the equipment and any issues and problems that arose. In particular, its

representatives owed a duty and/or assumed a duty to help Mr. and Mrs. Larson determine

what was causing their wheelchair to behave oddly, as described. As a result, Permobil and

its actual and apparent agents, servants, and employees owed pre-sale and post-sale duties

to Mr. Larson, Mrs. Larson, and others to exercise reasonable care in the performance of

business. The duties included, but were not limited to, duties to exercise reasonable care in

the design, manufacture, and sale of its products; in the instructions and warnings given

about its products; in the communications it had and information it shared about its

products; in training, monitoring, and supervising its representatives; and in performing

their duties, both inherent and assumed.

    40.    Unfortunately, Defendant, Permobil, Inc., directly and by and through its

actual and apparent agents, servants, and/or employees, violated their duties and were

negligent and careless in the following ways.

    a.    They failed to exercise reasonable care in the design and
manufacture of the wheelchair, head array, and/or sensors, making
it or them or them defective and unreasonably dangerous for Mr.
Larson to use in the normal, ordinary, and foreseeable manner. This
includes, but is not limited to, the wheelchair not being designed or
manufactured with an effective emergency stop that was capable of
stopping the wheelchair in the event of a malfunction; the head array
being designed with a fabric covering that absorbed and retained
sweat, hair products, and moisture transferred from users; the
sensors being designed in a way that made it unable to differentiate
between sweat, hair products, moisture, and users' heads; and others
that rendered it/them defective and unreasonably dangerous;

    b.    They failed to exercise reasonable care in instructing and warning
about the wheelchair, head array, and/or sensors, making it or them
defective and unreasonably dangerous for Mr. Larson to use in the
normal, ordinary, and foreseeable manner. This includes, but is not
limited to, a lack of instructions and/or warnings about sweat, hair
products, and moisture transferred from users causing wheelchairs
to unexpectedly and unintentionally move and putting them in
danger of injury; insufficient instructions and/or warnings about
sweat, hair products, and moisture transferred from users causing

wheelchairs to unexpectedly and unintentionally move that were inconspicuous; inconspicuous instructions and/or warnings due to their location, size, typography, and other reasons; instructions and/or warnings that did not clearly and intelligibly provide users with a way to protect themselves from harm while using the wheelchairs, head arrays, and/or sensors in the normal, ordinary, and foreseeable manner; lack of instructions on the machine and components themselves; creating and using instructions and/or warnings that were in conflict with one another and/or were ambiguous and confusing; and others that rendered it/them defective and unreasonably dangerous;

c.     They failed to exercise reasonable care in communicating with hospitals, medical supply companies, medical device service companies, users, and/or users' families about the capabilities, limitations, and risks associated with using its products. This includes, but is not limited to, a lack of communication about sweat, hair products, and moisture transferred from users causing wheelchairs to unexpectedly and unintentionally move and putting them in danger of injury; insufficient communication about these matters, whether due to conspicuity, wording, or other reasons; and lack of post-sale communications after they knew or should have known about this problem and the danger it presented;

d.     They failed to exercise reasonable care in identifying and diagnosing the cause of the Larson wheelchair's odd behavior, as described by the Larsons, at a time when it could have been addressed and remedied and Mr. Larson would not have been injured;

e.     They failed to exercise reasonable care in the training and education of their representatives and supervisory staff. This includes, but is not limited to, failing to train and educate them on the risk of wheelchairs, head arrays, and sensors malfunctioning due to sweat, hair products, and moisture transferring from users to hear arrays and causing inadvertent and unintentional movement of wheelchairs; failing to instruct them to communicate the above-stated risk to hospitals, device sellers, service contractors, users, and users' families; ailing to monitor and supervise them to ensure that they were communicating the above-stated risk to hospitals, device sellers, service contractors, users, and users' families; and otherwise allowing them to be negligent and careless in the performance of their duties;

f.     Their representatives, acting as their actual and apparent agents, servants, and employees, failed to adequately investigate the

Larsons' statements about the odd behavior of the chair and falsely represented that their companies were not aware of the risk or danger associated with sweat fooling a proximity sensor and causing either a runaway wheelchair or an unresponsive wheelchair that presented the same concern, both of which make the Defendants vicariously liable for these actions; and

g.    they were otherwise negligent and careless.

41.    As a direct and proximate result of the negligent acts and omissions complained of above, Mr. Larson suffered serious, painful, permanent, and disabling bodily injury, physical pain, mental and emotional anguish, emotional trauma, disfigurement, humiliation, inconvenience, physical impairment, and other related injuries. Additionally, Mr. Larson suffered significant economic damages and losses including, but not limited to, medical and other expenses and other related harms.

WHEREFORE, Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, claims damages against Defendant, Permobil, Inc., in the amount of three million dollars ($3,000,000) plus interest and all costs of this action.

### Count 3 – Strict Liability
### Permobil

42.    Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, hereby adopts and incorporates by reference paragraphs 1 through 31 as though they were fully and completely set forth herein.

43.    Defendant, Permobil, Inc., was the designer, assembler, manufacturer, distributor, and/or seller of the wheelchair, head array, and/or sensors at issue in this case.

44.    The wheelchair, head array, and/or sensors at issue in this case were defective and unreasonably dangerous when they left the hands of Defendant, Permobil, Inc., and they remained in this condition, without being altered, modified, or changed in

any material respect, until they caused John Larson to suffer the injuries, damages, and harms described herein.

45.     The wheelchair, head array, and/or sensors at issue in this case were designed, manufactured, distributed, and sold in a defective and unreasonably dangerous in the following ways.

a.     they were designed, manufactured, and sold in a defective and unreasonably dangerous condition that caused Mr. Larson to be seriously injured when he used them in a normal, ordinary, and foreseeable manner. These defects include, but are not limited to, the wheelchair not being designed or manufactured with an effective emergency stop that was capable of stopping the wheelchair in the event of a malfunction; the head array being designed with a fabric covering that absorbed and retained sweat, hair products, and moisture transferred from users; the sensors being designed in a way that made it unable to differentiate between sweat, hair products, moisture, and users' heads; and others that rendered it/them defective and unreasonably dangerous;

b.     they had instructions and warnings that made them defective and unreasonably dangerous and caused Mr. Larson to be seriously injured even though he used them in a normal, ordinary, and foreseeable manner. These defects include, a lack of instructions and/or warnings about sweat, hair products, and moisture transferred from users causing wheelchairs to unexpectedly and unintentionally move and putting them in danger of injury; insufficient instructions and/or warnings about sweat, hair products, and moisture transferred from users causing wheelchairs to unexpectedly and unintentionally move that were inconspicuous; inconspicuous instructions and/or warnings due to their location, size, typography, and other reasons; instructions and/or warnings that did not clearly and intelligibly provide users with a way to protect themselves from harm while using the wheelchairs, head arrays, and/or sensors in the normal, ordinary, and foreseeable manner; lack of instructions on the machine and components themselves; instructions and/or warnings that were in conflict with one another and/or were ambiguous and confusing; and others that rendered it/them defective and unreasonably dangerous; and

c.     they were otherwise defective and unreasonably dangerous.

46.     As a direct and proximate result of the defects complained of above, Mr. Larson suffered serious, painful, permanent, and disabling bodily injury, physical pain, mental and emotional anguish, emotional trauma, disfigurement, humiliation, inconvenience, physical impairment, and other related injuries. Additionally, Mr. Larson suffered significant economic damages and losses including, but not limited to, medical and other expenses and other related harms.

WHEREFORE, Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, claims damages against Defendant, Permobil, Inc., in the amount of three million dollars ($3,000,000) plus interest and all costs of this action.

## Count 4– Consumer Protection Act Violation
## Stealth Products and Pride/Quantum Rehab

47.     Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, hereby adopts and incorporates by reference paragraphs 1 through 31 as though they were fully and completely set forth herein.

48.     The State of Maryland has enacted consumer protection statutes establishing an enforceable right to truthful information from merchants about consumer goods and services and providing a remedy to all improper, unfair, and deceptive trade practices.

49.     At all times relevant to this cause of action, Defendants, Stealth Products, Inc., and Pride Mobility Products Corporation d/b/a Quantum Rehab, were merchants, persons, providers, and sellers of goods and services within the definitions and under the Maryland consumer protection statutes. They, individually and collectively, were the designer, assembler, manufacturer, distributor, and seller of the wheelchair, head array, and sensors at issue and provided brochures, manuals, instructions, and other documents

containing representations about its product and the services it rendered and/or was capable

of rendering. They also made their actual and apparent agents, servants, and employees

available to users, customers, and providers as a service to assist with potential problems

and issues with mobility equipment including wheelchairs, head arrays, and sensors used

in head arrays.

50.     Under the Maryland statutes, Stealth, Pride/Quantum Rehab, and their

actual and apparent agents, servants, and employees, were prohibited from representing

that goods and services have characteristics, uses, benefits, or qualities that they did not

have; representing that goods or services were of a particular standard, quality, grade, style

or model despite being another; misrepresenting material facts which had a tendency to

mislead; and failing to state material facts when not stating them had a tendency to mislead.

51.     Stealth and Pride/Quantum Rehab, directly and by and through its actual

and apparent agents, servants, and employees, engaged in unfair or deceptive trade

practices and violated Maryland's consumer protection statutes in the following ways.

a.      They misrepresented one or more material facts about the
        wheelchair, head array, and sensors at issue and/or their services
        which had a tendency to, and did, mislead the Larsons in violation
        of § 13-301, et seq., of the Annotated Code of Maryland.
        Specifically, they:

        (1)     misrepresented to the Larsons, directly and by implication,
                that the wheelchair, head array, sensors, and other
                components were safe to use without limitations based on
                the level of heat, humidity, or moisture present;

        (2)     misrepresented to the Larsons, directly and by implication,
                that the user of the wheelchair (in this case, Mr. Larson) did
                not need to take any precautions when using the wheelchair
                in hot, humid, or moist conditions;

(3)     misrepresented to the Larsons, directly and by implication, that the user of the wheelchair (in this case, Mr. Larson) could stop the wheelchair even if it malfunctioned;

(4)     misrepresented to the Larsons, directly and by implication, that the wheelchair could not move on its own, there was no explanation for the Larsons' observations, and/or the Larsons must have been mistaken;

(5)     misrepresented to the Larsons, directly and by implication, that the wheelchair, head array, and sensors did not have latent defects, dangers, or hazards that made it unreasonably dangerous;

(6)     misrepresented to the Larsons, directly and by implication, that they were experts in the field of wheelchair safety, use, and operation;

(7)     misrepresented to the Larsons, directly and by implication, that they were fully informed about all of the capabilities, limitations, and risks involved in using the wheelchair, head array, and sensors;

(8)     misrepresented to the Larsons, directly and by implication, that they had been trained by the manufacturers of the wheelchair, head array, and sensors about all of the capabilities, limitations, and risks involved in using the equipment;

(9)     misrepresented to the Larsons, directly and by implication, that they had informed the Larsons about all of the warnings and instructions provided by the manufacturers or the wheelchair, head array, and sensors;

(10)   misrepresented to the Larsons, directly and by implication, that Mr. Larson would be able to operate the wheelchair safely if he followed the instructions and warnings they had given him;

(11)   misrepresented to the Larsons, directly and by implication, that they had spoken to representatives of the manufacturers of the wheelchair, head array, and sensors to determine what was causing the wheelchair to behave oddly;

(12)   misrepresented to the Larsons, directly and by implication, that they would act as a go-between with the manufacturers

of the wheelchair, head array, and sensors to determine what was causing the wheelchair to behave oddly;

(13)   misrepresented to the Larsons, directly and by implication, that they would act as a fiduciary to them; and

(14)   misrepresented to the Larsons, directly and by implication, that they had sufficient training and/or knowledge about the wheelchair, head array, and sensors to adequately train Mr. Larson to safely use the equipment.

b.   They failed to state one or more material facts about the about the wheelchair, head array, and sensors at issue and/or their services which had a tendency to, and did, mislead the Larsons in violation of § 13-301, et seq., of the Annotated Code of Maryland. Specifically, they:

(1)   failed to state that the wheelchair, head array, sensors, and other components could malfunction if sweat, hair products, or other moisture was transferred to the head array fabric in front of the sensor;

(2)   failed to state that if the wheelchair, head array, sensors, and other components malfunctioned, it could cause the wheelchair to unexpectedly and inadvertently move and/or become nonresponsive;

(3)   failed to state that if the wheelchair unexpectedly and inadvertently moved and/or become nonresponsive, it could cause the user (in this case, Mr. Larson) to suffer serious bodily injury;

(4)   failed to state that there was research indicating and/or prior incidents in which a wheelchair malfunctioned due to sweat, hair products, or other moisture that caused the wheelchair to unexpectedly and inadvertently move and/or become nonresponsive, putting its user at risk of injury;

(5)   failed to state to the Larsons, directly and by implication, that the wheelchair, head array, sensors, and other components were unsafe to use without taking precautions based on the level of heat, humidity, or moisture present;

(6)   failed to state to the Larsons, directly and by implication, that Mr. Larson needed to take precautions for his own safety

when using the wheelchair in hot, humid, or moist conditions;

(7)    failed to state to the Larsons, directly and by implication, that Mrs. Larson needed to take precautions for Mr. Larson's safety when he was using the wheelchair in hot, humid, or moist conditions;

(8)    failed to state to the Larsons, directly and by implication, that Mr. Larson would likely not be able to stop the wheelchair if it malfunctioned;

(9)    failed to state to the Larsons, directly and by implication, that the wheelchair could move on its own if it was malfunctioning due to sweat, hair products, or moisture transferring to the head array and fooling the sensor into believing that Mr. Larson was present when he was not;

(10)    failed to state to the Larsons, directly and by implication, that the wheelchair, head array, and/or sensors had latent defects, dangers, or hazards that made them/it unreasonably dangerous; and

(11)    failed to state to the Larsons, directly and by implication, that they were not experts in the field of wheelchair safety, use, and operation;

(12)    failed to state to the Larsons, directly and by implication, that they were not fully informed about all of the capabilities, limitations, and risks involved in using the wheelchair, head array, and sensors;

(13)    failed to state to the Larsons, directly and by implication, that they had not been trained by the manufacturers of the wheelchair, head array, and sensors about all of the capabilities, limitations, and risks involved in using the equipment;

(14)    failed to state to the Larsons, directly and by implication, that they had not informed the Larsons about all of the warnings and instructions provided by the manufacturers or the wheelchair, head array, and sensors;

(15)    failed to state to the Larsons, directly and by implication, that they had not spoken to representatives of the manufacturers

of the wheelchair, head array, and sensors to determine what was causing the wheelchair to behave oddly;

(16) failed to state to the Larsons, directly and by implication, that they would not act as a go-between with the manufacturers of the wheelchair, head array, and sensors to determine what was causing the wheelchair to behave oddly;

(17) failed to state to the Larsons, directly and by implication, that they would not act as a fiduciary to them;

(18) failed to state to the Larsons, directly and by implication, that they had insufficient training and/or knowledge about the wheelchair, head array, and sensors to adequately train Mr. Larson to safely use the equipment.

(19) failed to state to the Larsons, directly and by implication, that they did not know whether the wheelchair, head array, sensors, and other components were unsafe to use without taking precautions based on the level of heat, humidity, or moisture present;

(20) failed to state to the Larsons, directly and by implication, that they did not know whether Mr. Larson needed to take precautions for his own safety when using the wheelchair in hot, humid, or moist conditions;

(21) failed to state to the Larsons, directly and by implication, that they did not know whether Mrs. Larson needed to take precautions for Mr. Larson's safety when he was using the wheelchair in hot, humid, or moist conditions;

(22) failed to state to the Larsons, directly and by implication, that they did not know whether Mr. Larson would likely not be able to stop the wheelchair if it malfunctioned;

(23) failed to state to the Larsons, directly and by implication, that they did not know whether the wheelchair could move on its own if it was malfunctioning due to sweat, hair products, or moisture transferring to the head array and fooling the sensor into believing that Mr. Larson was present when he was not; and

(24) failed to state to the Larsons, directly and by implication, that they did not know whether the wheelchair, head array,

and/or sensors had latent defects, dangers, or hazards that
made them/it unreasonably dangerous.

52.     As a direct and proximate result of these unfair and deceptive trade
practices, misrepresentations, and/or failures to state material facts, Mr. Larson suffered
serious, painful, permanent, and disabling bodily injury, physical pain, mental and
emotional anguish, emotional trauma, disfigurement, humiliation, inconvenience, physical
impairment, and other related injuries. Additionally, Mr. Larson suffered significant
economic damages and losses including, but not limited to, medical and other expenses
and other related harms.

WHEREFORE, Plaintiff, Julie Larson, as Personal Representative of the Estate of
John Larson, claims damages against Defendants, Stealth Products, Inc. and Pride Mobility
Products Corporation d/b/a Quantum Rehab, jointly and severally, in the amount of three
million dollars ($3,000,000) plus interest and all costs of this action.

**Count 5 – Negligence**
**Stealth Products and Pride/Quantum Rehab**

53.     Plaintiff, Julie Larson, as Personal Representative of the Estate of John
Larson, hereby adopts and incorporates by reference paragraphs 1 through 31 as though
they were fully and completely set forth herein.

54.     Defendants, Stealth Products, Inc. and Pride Mobility Products Corporation
d/b/a Quantum Rehab, were the designers, assemblers, manufacturers, distributors, and/or
sellers of the wheelchair, head array, and/or sensors at issue in this case. They
communicated with hospitals, medical supply companies, medical device service
companies, users, and users' families about the capabilities, limitations, and risks
associated with using its products. They made their representatives available to hospitals,

medical supply companies, medical device service companies, users, and users' families to discuss the equipment and any issues and problems that arose. Its representatives either had a duty or assumed a duty to help Mr. and Mrs. Larson determine what was causing their wheelchair to behave oddly, as they described it. As a result, Stealth and Pride/Quantum Rehab and their actual and apparent agents, servants, and employees owed pre-sale and post-sale duties to Mr. Larson, Mrs. Larson, and others to exercise reasonable care in the performance of business. The duties included, but were not limited to, duties to exercise reasonable care in the design, manufacture, and sale of its products; in the instructions and warnings given about its products; in the communications they had and information it shared about their products; in training, monitoring, and supervising its representatives; and in performing their duties, both inherent and assumed.

55. Unfortunately, Defendants, Stealth Products, Inc. and Pride Mobility Products Corporation d/b/a Quantum Rehab, directly and by and through its actual and apparent agents, servants, and/or employees, violated their duties and were negligent and careless in the following ways.

a. They failed to exercise reasonable care in the design and manufacture of the wheelchair, head array, and/or sensors, making it or them or them defective and unreasonably dangerous for Mr. Larson to use in the normal, ordinary, and foreseeable manner. This includes, but is not limited to, the wheelchair not being designed or manufactured with an effective emergency stop that was capable of stopping the wheelchair in the event of a malfunction; the head array being designed with a fabric covering that absorbed and retained sweat, hair products, and moisture transferred from users; the sensors being designed in a way that made it unable to differentiate between sweat, hair products, moisture, and users' heads; and others that rendered it/them defective and unreasonably dangerous;

b. They failed to exercise reasonable care in instructing and warning about the wheelchair, head array, and/or sensors, making it or them defective and unreasonably dangerous for Mr. Larson to use in the

normal, ordinary, and foreseeable manner. This includes, but is not limited to, a lack of instructions and/or warnings about sweat, hair products, and moisture transferred from users causing wheelchairs to unexpectedly and unintentionally move and putting them in danger of injury; insufficient instructions and/or warnings about sweat, hair products, and moisture transferred from users causing wheelchairs to unexpectedly and unintentionally move that were inconspicuous; inconspicuous instructions and/or warnings due to their location, size, typography, and other reasons; instructions and/or warnings that did not clearly and intelligibly provide users with a way to protect themselves from harm while using the wheelchairs, head arrays, and/or sensors in the normal, ordinary, and foreseeable manner; lack of instructions on the machine and components themselves; creating and using instructions and/or warnings that were in conflict with one another and/or were ambiguous and confusing; and others that rendered it/them defective and unreasonably dangerous;

c. They failed to exercise reasonable care in communicating with hospitals, medical supply companies, medical device service companies, users, and/or users' families about the capabilities, limitations, and risks associated with using its products. This includes, but is not limited to, a lack of communication about sweat, hair products, and moisture transferred from users causing wheelchairs to unexpectedly and unintentionally move and putting them in danger of injury; insufficient communication about these matters, whether due to conspicuity, wording, or other reasons; and lack of post-sale communications after they knew or should have known about this problem and the danger it presented;

d. They failed to exercise reasonable care in identifying and diagnosing the cause of the Larson wheelchair's odd behavior, as described by the Larsons, at a time when it could have been addressed and remedied and Mr. Larson would not have been injured;

e. They failed to exercise reasonable care in the training and education of their representatives and supervisory staff. This includes, but is not limited to, failing to train and educate them on the risk of wheelchairs, head arrays, and sensors malfunctioning due to sweat, hair products, and moisture transferring from users to hear arrays and causing inadvertent and unintentional movement of wheelchairs; failing to instruct them to communicate the above-stated risk to hospitals, device sellers, service contractors, users, and users' families; ailing to monitor and supervise them to ensure that they were communicating the above-stated risk to hospitals, device

sellers, service contractors, users, and users' families; and otherwise allowing them to be negligent and careless in the performance of their duties;

f.   Their representatives, acting as their actual and apparent agents, servants, and employees, failed to adequately investigate the Larsons' statements about the odd behavior of the chair and falsely represented that their companies were not aware of the risk or danger associated with sweat fooling a proximity sensor and causing either a runaway wheelchair or an unresponsive wheelchair that presented the same concern, both of which make the Defendants vicariously liable for these actions; and

g.   they were otherwise negligent and careless.

56.   As a direct and proximate result of the negligent acts and omissions complained of above, Mr. Larson suffered serious, painful, permanent, and disabling bodily injury, physical pain, mental and emotional anguish, emotional trauma, disfigurement, humiliation, inconvenience, physical impairment, and other related injuries. Additionally, Mr. Larson suffered significant economic damages and losses including, but not limited to, medical and other expenses and other related harms.

WHEREFORE, Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, claims damages against Defendants, Stealth Products, Inc., and Pride Mobility Products Corporation d/b/a Quantum Rehab, jointly and severally, in the amount of three million dollars ($3,000,000) plus interest and all costs of this action.

### Count 6 – Strict Liability
### Stealth Products and Pride/Quantum Rehab

57.   Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, hereby adopts and incorporates by reference paragraphs 1 through 31 as though they were fully and completely set forth herein.

58. Defendants, Stealth Products, Inc. and Pride Mobility Products Corporation d/b/a Quantum Rehab, were the designers, assemblers, manufacturers, distributors, and/or sellers of the wheelchair, head array, and/or sensors at issue in this case.

59. The wheelchair, head array, and/or sensors at issue in this case were defective and unreasonably dangerous when they left the hands of Defendants, Stealth Products and Pride/Quantum Rehab, and they remained in this condition, without being altered, modified, or changed in any material respect, until they caused John Larson to suffer the injuries, damages, and harms described herein.

60. The wheelchair, head array, and/or sensors at issue in this case were designed, manufactured, distributed, and sold in a defective and unreasonably dangerous in the following ways.

a. they were designed, manufactured, and sold in a defective and unreasonably dangerous condition that caused Mr. Larson to be seriously injured even though he was using them in a normal, ordinary, and foreseeable manner. These defects include, but are not limited to, the wheelchair not being designed or manufactured with an effective emergency stop that was capable of stopping the wheelchair in the event of a malfunction; the head array being designed with a fabric covering that absorbed and retained sweat, hair products, and moisture transferred from users; the sensors being designed in a way that made it unable to differentiate between sweat, hair products, moisture, and users' heads; and others that rendered it/them defective and unreasonably dangerous;

b. they were designed, manufactured, and sold without or with inadequate warnings and instructions, rendering them defective and unreasonably dangerous condition, and causing Mr. Larson to be seriously injured even though he was using them in a normal, ordinary, and foreseeable manner. These defects include, a lack of instructions and/or warnings about sweat, hair products, and moisture transferred from users causing wheelchairs to unexpectedly and unintentionally move and putting them in danger of injury; insufficient instructions and/or warnings about sweat, hair products, and moisture transferred from users causing wheelchairs to unexpectedly and unintentionally move that were inconspicuous;

inconspicuous instructions and/or warnings due to their location, size, typography, and other reasons; instructions and/or warnings that did not clearly and intelligibly provide users with a way to protect themselves from harm while using the wheelchairs, head arrays, and/or sensors in the normal, ordinary, and foreseeable manner; lack of instructions on the machine and components themselves; instructions and/or warnings that were in conflict with one another and/or were ambiguous and confusing; and others that rendered it/them defective and unreasonably dangerous; and

c.      they were otherwise defective and unreasonably dangerous.

61.     As a direct and proximate result of the defects complained of above, Mr. Larson suffered serious, painful, permanent, and disabling bodily injury, physical pain, mental and emotional anguish, emotional trauma, disfigurement, humiliation, inconvenience, physical impairment, and other related injuries. Additionally, Mr. Larson suffered significant economic damages and losses including, but not limited to, medical and other expenses and other related harms.

WHEREFORE, Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, claims damages against Defendants, Stealth Products, Inc. and Pride Mobility Products Corporation d/b/a Quantum Rehab, in the amount of three million dollars ($3,000,000) plus interest and all costs of this action.

<h3 align="center">Count 7 – Consumer Protection Act Violation<br>Med Inc. and United Seating/Numotion</h3>

62.     Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, hereby adopts and incorporates by reference paragraphs 1 through 43 as though they were fully and completely set forth herein.

63.     The State of Maryland has enacted consumer protection statutes establishing an enforceable right to truthful information from merchants about consumer

goods and services and providing a remedy to all improper, unfair, and deceptive trade practices.

64.    At all times relevant to this cause of action, Defendants, Med Inc. and United Seating and Mobility LLC d/b/a Numotion, were merchants, persons, providers, and sellers of goods and services within the definitions and under the Maryland consumer protection statutes. They, individually and collectively, were the sellers of and/or service contract providers for wheelchairs, head arrays, and sensors, including the wheelchair, head array, and sensors at issue. They also made their actual and apparent agents, servants, and employees available to users, customers, and providers as a service to assist with potential problems and issues with mobility equipment including wheelchairs, head arrays, and sensors used in head arrays, including the Larsons, National Rehabilitation, and Medstar.

65.    Under the Maryland statutes, Med Inc., United Seating d/b/a Numotion, and their actual and apparent agents, servants, and employees, were prohibited from representing that goods and services have characteristics, uses, benefits, or qualities that they did not have; representing that goods or services were of a particular standard, quality, grade, style or model despite being another; misrepresenting material facts which had a tendency to mislead; and failing to state material facts when not stating them had a tendency to mislead.

66.    Med. Inc. and United Seating/Numotion, directly and by and through its actual and apparent agents, servants, and employees, engaged in unfair or deceptive trade practices and violated the Maryland consumer protection statutes in the following ways.

    a.    They misrepresented one or more material facts about the wheelchair, head array, and sensors at issue and/or their services which had a tendency to, and did, mislead the Larsons in violation

of § 13-301, et seq., of the Annotated Code of Maryland. Specifically, they:

(1)     misrepresented to the Larsons, directly and by implication, that the wheelchair, head array, sensors, and other components were safe to use without limitations based on the level of heat, humidity, or moisture present;

(2)     misrepresented to the Larsons, directly and by implication, that the user of the wheelchair (in this case, Mr. Larson) did not need to take any precautions when using the wheelchair in hot, humid, or moist conditions;

(3)     misrepresented to the Larsons, directly and by implication, that the user of the wheelchair (in this case, Mr. Larson) could stop the wheelchair even if it malfunctioned;

(4)     misrepresented to the Larsons, directly and by implication, that the wheelchair could not move on its own, there was no explanation for the Larsons' observations, and/or the Larsons must have been mistaken;

(5)     misrepresented to the Larsons, directly and by implication, that the wheelchair, head array, and sensors did not have latent defects, dangers, or hazards that made it unreasonably dangerous;

(6)     misrepresented to the Larsons, directly and by implication, that they were experts in the field of wheelchair safety, use, and operation;

(7)     misrepresented to the Larsons, directly and by implication, that they were fully informed about all of the capabilities, limitations, and risks involved in using the wheelchair, head array, and sensors;

(8)     misrepresented to the Larsons, directly and by implication, that they had been trained by the manufacturers of the wheelchair, head array, and sensors about all of the capabilities, limitations, and risks involved in using the equipment;

(9)     misrepresented to the Larsons, directly and by implication, that they had informed the Larsons about all of the warnings and instructions provided by the manufacturers or the wheelchair, head array, and sensors;

(10)   misrepresented to the Larsons, directly and by implication, that Mr. Larson would be able to operate the wheelchair safely if he followed the instructions and warnings they had given him;

(11)   misrepresented to the Larsons, directly and by implication, that they had spoken to representatives of the manufacturers of the wheelchair, head array, and sensors to determine what was causing the wheelchair to behave oddly;

(12)   misrepresented to the Larsons, directly and by implication, that they would act as a go-between with the manufacturers of the wheelchair, head array, and sensors to determine what was causing the wheelchair to behave oddly;

(13)   misrepresented to the Larsons, directly and by implication, that they would act as a fiduciary to them; and

(14)   misrepresented to the Larsons, directly and by implication, that they had sufficient training and/or knowledge about the wheelchair, head array, and sensors to adequately train Mr. Larson to safely use the equipment.

b.   They failed to state one or more material facts about the about the wheelchair, head array, and sensors at issue and/or their services which had a tendency to, and did, mislead the Larsons in violation of § 13-301, et seq., of the Annotated Code of Maryland. Specifically, they:

(1)   failed to state that the wheelchair, head array, sensors, and other components could malfunction if sweat, hair products, or other moisture was transferred to the head array fabric in front of the sensor;

(2)   failed to state that if the wheelchair, head array, sensors, and other components malfunctioned, it could cause the wheelchair to unexpectedly and inadvertently move and/or become nonresponsive;

(3)   failed to state that if the wheelchair unexpectedly and inadvertently moved and/or become nonresponsive, it could cause the user (in this case, Mr. Larson) to suffer serious bodily injury;

(4)     failed to state that there was research indicating and/or prior incidents in which a wheelchair malfunctioned due to sweat, hair products, or other moisture that caused the wheelchair to unexpectedly and inadvertently move and/or become nonresponsive, putting its user at risk of injury;

(5)     failed to state to the Larsons, directly and by implication, that the wheelchair, head array, sensors, and other components were unsafe to use without taking precautions based on the level of heat, humidity, or moisture present;

(6)     failed to state to the Larsons, directly and by implication, that Mr. Larson needed to take precautions for his own safety when using the wheelchair in hot, humid, or moist conditions;

(7)     failed to state to the Larsons, directly and by implication, that Mrs. Larson needed to take precautions for Mr. Larson's safety when he was using the wheelchair in hot, humid, or moist conditions;

(8)     failed to state to the Larsons, directly and by implication, that Mr. Larson would likely not be able to stop the wheelchair if it malfunctioned;

(9)     failed to state to the Larsons, directly and by implication, that the wheelchair could move on its own if it was malfunctioning due to sweat, hair products, or moisture transferring to the head array and fooling the sensor into believing that Mr. Larson was present when he was not;

(10)    failed to state to the Larsons, directly and by implication, that the wheelchair, head array, and/or sensors had latent defects, dangers, or hazards that made them/it unreasonably dangerous; and

(11)    failed to state to the Larsons, directly and by implication, that they were not experts in the field of wheelchair safety, use, and operation;

(12)    failed to state to the Larsons, directly and by implication, that they were not fully informed about all of the capabilities, limitations, and risks involved in using the wheelchair, head array, and sensors;

(13)   failed to state to the Larsons, directly and by implication, that they had not been trained by the manufacturers of the wheelchair, head array, and sensors about all of the capabilities, limitations, and risks involved in using the equipment;

(14)   failed to state to the Larsons, directly and by implication, that they had not informed the Larsons about all of the warnings and instructions provided by the manufacturers or the wheelchair, head array, and sensors;

(15)   failed to state to the Larsons, directly and by implication, that they had not spoken to representatives of the manufacturers of the wheelchair, head array, and sensors to determine what was causing the wheelchair to behave oddly;

(16)   failed to state to the Larsons, directly and by implication, that they would not act as a go-between with the manufacturers of the wheelchair, head array, and sensors to determine what was causing the wheelchair to behave oddly;

(17)   failed to state to the Larsons, directly and by implication, that they would not act as a fiduciary to them;

(18)   failed to state to the Larsons, directly and by implication, that they had insufficient training and/or knowledge about the wheelchair, head array, and sensors to adequately train Mr. Larson to safely use the equipment.

(19)   failed to state to the Larsons, directly and by implication, that they did not know whether the wheelchair, head array, sensors, and other components were unsafe to use without taking precautions based on the level of heat, humidity, or moisture present;

(20)   failed to state to the Larsons, directly and by implication, that they did not know whether Mr. Larson needed to take precautions for his own safety when using the wheelchair in hot, humid, or moist conditions;

(21)   failed to state to the Larsons, directly and by implication, that they did not know whether Mrs. Larson needed to take precautions for Mr. Larson's safety when he was using the wheelchair in hot, humid, or moist conditions;

(22)    failed to state to the Larsons, directly and by implication, that they did not know whether Mr. Larson would likely not be able to stop the wheelchair if it malfunctioned;

(23)    failed to state to the Larsons, directly and by implication, that they did not know whether the wheelchair could move on its own if it was malfunctioning due to sweat, hair products, or moisture transferring to the head array and fooling the sensor into believing that Mr. Larson was present when he was not; and

(24)    failed to state to the Larsons, directly and by implication, that they did not know whether the wheelchair, head array, and/or sensors had latent defects, dangers, or hazards that made them/it unreasonably dangerous.

67.    As a direct and proximate result of these unfair and deceptive trade practices, misrepresentations, and/or failures to state material facts, Mr. Larson suffered serious, painful, permanent, and disabling bodily injury, physical pain, mental and emotional anguish, emotional trauma, disfigurement, humiliation, inconvenience, physical impairment, and other related injuries. Additionally, Mr. Larson suffered significant economic damages and losses including, but not limited to, medical and other expenses and other related harms.

WHEREFORE, Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, claims damages against Defendants, Med Inc. and United Seating and Mobility LLC d/b/a Numotion, jointly and severally, in the amount of three million dollars ($3,000,000) plus interest and all costs of this action.

### Count 8 –Negligence
**Med Inc. and United Seating/Numotion**

68.    Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, hereby adopts and incorporates by reference paragraphs 1 through 31 as though they were fully and completely set forth herein.

69. Defendants, Med Inc. and United Seating and Mobility LLC d/b/a Numotion, were companies that contracted with Mr. and Mrs. Larson to inspect, maintain, troubleshoot, and repair the wheelchair, head array, and sensors at issue. They also communicated with agents and employees of National Rehabilitation Hospital and Medstar, and Mr. and Mrs. Larson about the wheelchair occasionally behaving oddly. Their representatives agreed to help Mr. and Mrs. Larson determine what was causing these issues, an agreement that Mr. and Mrs. Larson relied upon to their detriment. As a result, Med Inc., United Seating/Numotion, and their actual and apparent agents, servants, and employees owed duties to Mr. Larson, Mrs. Larson, and others to exercise reasonable care in the performance of business. The duties included, but were not limited to, duties to exercise reasonable care in the inspection, maintenance, troubleshooting, and repair of the wheelchair, head array, and sensors at issues; in the instructions and warnings given about the products; in the communications they had and information they shared about the products; in training, monitoring, and supervising their representatives; and in performing their duties, both inherent and assumed.

70. Unfortunately, Defendants, Med Inc. and United Seating and Mobility LLC d/b/a Numotion, directly and by and through its actual and apparent agents, servants, and/or employees, violated their duties and were negligent and careless in the following ways:

a. they failed to instruct and warn the Larsons that sweat, hair products, and moisture transferred to the head array could cause the wheelchair to unexpectedly and unintentionally move and put Mr. Larson in danger of injury;

b. they provided insufficient instructions and/or warnings about the use and operation of the wheelchair, head array, and sensors generally and, in particular, in preventing sweat, hair products, and moisture from being transferred and causing the wheelchair to move

unexpectedly and unintentionally, putting Mr. Larson in danger of being injured;

c.      they failed to exercise reasonable care in communicating with National Rehabilitation Hospital, Medstar, and their actual and apparent agents, servants, and/or employees about the use and operation of the wheelchair, head array, and sensors generally and, in particular, in preventing sweat, hair products, and moisture from being transferred and causing the wheelchair to move unexpectedly and unintentionally, putting Mr. Larson in danger of being injured;

d.      they failed to exercise reasonable care in communicating with Mr. and Mrs. Larson about the use and operation of the wheelchair, head array, and sensors generally and, in particular, in preventing sweat, hair products, and moisture from being transferred and causing the wheelchair to move unexpectedly and unintentionally, putting Mr. Larson in danger of being injured;

e.      they failed to identify and diagnose sweat, hair products, and moisture as potential causes of the wheelchair's inadvertent and unintentional movement and/or odd behavior, as described, at a time when doing so would have prevented Mr. Larson from being injured;

d.      they failed to exercise reasonable care in identifying and diagnosing the cause of the Larson wheelchair's odd behavior, as described by the Larsons, at a time when it could have been addressed and remedied and Mr. Larson would not have been injured;

e.      they failed to exercise reasonable care in the training and education of their representatives and supervisory staff. This includes, but is not limited to, failing to train and educate them on the risk of wheelchairs, head arrays, and sensors malfunctioning due to sweat, hair products, and moisture transferring from users to hear arrays and causing inadvertent and unintentional movement of wheelchairs; failing to instruct them to communicate the above-stated risk to hospitals, device sellers, service contractors, users, and users' families; ailing to monitor and supervise them to ensure that they were communicating the above-stated risk to hospitals, device sellers, service contractors, users, and users' families; and otherwise allowing them to be negligent and careless in the performance of their duties;

f.      their representatives, acting as their actual and apparent agents, servants, and employees, failed to adequately investigate the Larsons' statements about the odd behavior of the chair and falsely

represented that their companies were not aware of the risk or danger associated with sweat fooling a proximity sensor and causing either a runaway wheelchair or an unresponsive wheelchair that presented the same concern, both of which make the Defendants vicariously liable for these actions; and

g.     they were otherwise negligent and careless.

71.     As a direct and proximate result of the negligent acts and omissions complained of above, Mr. Larson suffered serious, painful, permanent, and disabling bodily injury, physical pain, mental and emotional anguish, emotional trauma, disfigurement, humiliation, inconvenience, physical impairment, and other related injuries. Additionally, Mr. Larson suffered significant economic damages and losses including, but not limited to, medical and other expenses and other related harms.

WHEREFORE, Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, claims damages against Defendants, Med Inc. and United Seating and Mobility LLC d/b/a Numotion, jointly and severally, in the amount of three million dollars ($3,000,000) plus interest and all costs of this action.

## Count 9 – Strict Liability
## Med Inc.

72.     Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, hereby adopts and incorporates by reference paragraphs 1 through 31 as though they were fully and completely set forth herein.

73.     Defendant, Med Inc., was a distributor and seller the wheelchair, head array, and/or sensors at issue in this case.

74.     The wheelchair, head array, and/or sensors at issue in this case were defective and unreasonably dangerous when Med Inc. sold them and delivered them to the Larsons, and they remained in this condition, without being altered, modified, or changed

in any material respect, until they caused John Larson to suffer the injuries, damages, and harms described herein.

75.     The wheelchair, head array, and/or sensors at issue in this case were defective and unreasonably dangerous in the following ways.

a.     They were designed, manufactured, and sold in a defective and unreasonably dangerous condition that caused Mr. Larson to be seriously injured even though he was using them in a normal, ordinary, and foreseeable manner. These defects include, but are not limited to, the wheelchair not being designed or manufactured with an effective emergency stop that was capable of stopping the wheelchair in the event of a malfunction; the head array being designed with a fabric covering that absorbed and retained sweat, hair products, and moisture transferred from users; the sensors being designed in a way that made it unable to differentiate between sweat, hair products, moisture, and users' heads; and others that rendered it/them defective and unreasonably dangerous;

b.     they had instructions and warnings that made them defective and unreasonably dangerous and caused Mr. Larson to be seriously injured even though he used them in a normal, ordinary, and foreseeable manner. These defects include, a lack of instructions and/or warnings about sweat, hair products, and moisture transferred from users causing wheelchairs to unexpectedly and unintentionally move and putting them in danger of injury; insufficient instructions and/or warnings about sweat, hair products, and moisture transferred from users causing wheelchairs to unexpectedly and unintentionally move that were inconspicuous; inconspicuous instructions and/or warnings due to their location, size, typography, and other reasons; instructions and/or warnings that did not clearly and intelligibly provide users with a way to protect themselves from harm while using the wheelchairs, head arrays, and/or sensors in the normal, ordinary, and foreseeable manner; lack of instructions on the machine and components themselves; instructions and/or warnings that were in conflict with one another and/or were ambiguous and confusing; and others that rendered it/them defective and unreasonably dangerous; and

c.     they were otherwise defective and unreasonably dangerous.

76.     As a direct and proximate result of the defects complained of above, Mr. Larson suffered serious, painful, permanent, and disabling bodily injury, physical pain,

mental and emotional anguish, emotional trauma, disfigurement, humiliation, inconvenience, physical impairment, and other related injuries. Additionally, Mr. Larson suffered significant economic damages and losses including, but not limited to, medical and other expenses and other related harms.

WHEREFORE, Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, claims damages against Defendant, Med Inc., in the amount of three million dollars ($3,000,000) plus interest and all costs of this action.

## Count 10 – Loss of Consortium and Time Spent Together
### All Defendants

77.     Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, and in her individual capacity, hereby adopts and incorporates by reference paragraphs 1 through 76 as though they were fully and completely set forth herein.

78.     John and Julie Larson were married, and lived together as husband and wife, at all times relevant to this cause of action.

79.     As a direct and proximate result of the actions, omissions, violations, and/or defects outlined herein, Mr. and Mrs. Larson were caused to suffer time apart from each other, less enjoyable time with each other, emotional upset and anguish, emotional trauma, inconvenience, frustration, and other related injuries and harms due to a loss of consortium.

WHEREFORE, Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, claims damages against Defendant, Med Inc., in the amount of one million dollars ($1,000,000) plus interest and all costs of this action.

Respectfully submitted,

_____ */s/ Gregory G. Hopper* _____

Gregory G. Hopper (9912150047)
hopper@mdtrialfirm.com
Bekman, Marder, Hopper, Malarkey & Perlin LLC
1829 Reisterstown Road, Suite 200
Baltimore, Maryland 21208
(410) 539-6633

Attorneys for Plaintiff

**IN THE CIRCUIT COURT FOR CALVERT COUNTY, MARYLAND**

| | |
|---|---|
| **JULIE LARSON** | |
| **Plaintiff** | |
| **v.** | **Case No.** C-04-CV-22-000510 |
| **PERMOBIL, INC., et al.** | |
| **Defendants** | |

## DEMAND FOR JURY TRIAL

Plaintiff, Julie Larson, as Personal Representative of the Estate of John Larson, and on behalf of herself and John Larson as husband and wife, by and through her attorneys, Gregory G. Hopper and Bekman, Marder, Hopper, Malarkey & Perlin, LLC, hereby demands a jury trial on all counts and claims brought in the above-captioned action.

Respectfully submitted,

_____/s/ Gregory G. Hopper_____
Gregory G. Hopper (9912150047)
hopper@mdtrialfirm.com
Bekman, Marder, Hopper, Malarkey & Perlin LLC
1829 Reisterstown Road, Suite 200
Baltimore, Maryland 21208
(410) 539-6633

Attorneys for Plaintiff

E-FILED; Calvert Circuit Court
Docket: 11/10/2022 9:45 AM; Submission: 11/10/2022 9:45 AM

IN THE CIRCUIT COURT FOR Calvert County
                                    (City or County)

## CIVIL – NON-DOMESTIC CASE INFORMATION SHEET

### DIRECTIONS

*Plaintiff:* This Information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Judge of the Court of Appeals pursuant to Rule 2-111(a).

*Defendant:* You must file an Information Report as required by Rule 2-323(h).

***THIS INFORMATION REPORT CANNOT BE ACCEPTED AS A PLEADING***

| | |
|---|---|
| **FORM FILED BY:** ☒ PLAINTIFF ☐ DEFENDANT | CASE NUMBER C-04-CV-22-000510 |
| | (Clerk to insert) |
| **CASE NAME:** Julie Larson          vs.   Permobil, Inc., et al | |
|            Plaintiff                        Defendant | |
| **PARTY'S NAME:** _____ | **PHONE:** _____ |
| **PARTY'S ADDRESS:** _____ | |
| **PARTY'S E-MAIL:** _____ | |

**If represented by an attorney:**

**PARTY'S ATTORNEY'S NAME:**  Gregory G. Hopper                **PHONE:** 410-539-6633

**PARTY'S ATTORNEY'S ADDRESS:**  1829 Reisterstown Road, Suite 200, Baltimore, MD 21208

**PARTY'S ATTORNEY'S E-MAIL:**  hopper@mdtrialfirm.com

**JURY DEMAND?** ☒ Yes ☐ No

**RELATED CASE PENDING?** ☐ Yes ☒ No  If yes, Case #(s), if known: _____

**ANTICIPATED LENGTH OF TRIAL?:** _____ hours _____ days

### PLEADING TYPE

**New Case:**  ☒ Original        ☐ Administrative Appeal        ☐ Appeal
**Existing Case:** ☐ Post-Judgment        ☐ Amendment
*If filing in an existing case,* skip Case Category/ Subcategory section – go to Relief section.

### IF NEW CASE: CASE CATEGORY/SUBCATEGORY (Check one box.)

**TORTS**
☐ Asbestos
☐ Assault and Battery
☐ Business and Commercial
☐ Conspiracy
☐ Conversion
☐ Defamation
☐ False Arrest/Imprisonment
☐ Fraud
☐ Lead Paint – DOB of Youngest Plt:_____
☐ Loss of Consortium
☐ Malicious Prosecution
☐ Malpractice-Medical
☐ Malpractice-Professional
☐ Misrepresentation
☐ Motor Tort
☒ Negligence
☐ Nuisance
☐ Premises Liability
☒ Product Liability
☐ Specific Performance
☐ Toxic Tort
☐ Trespass
☐ Wrongful Death

**CONTRACT**
☐ Asbestos
☐ Breach
☐ Business and Commercial
☐ Confessed Judgment (Cont'd)
☐ Construction
☐ Debt
☐ Fraud

☐ Government
☐ Insurance
☐ Product Liability

**PROPERTY**
☐ Adverse Possession
☐ Breach of Lease
☐ Detinue
☐ Distress/Distrain
☐ Ejectment
☐ Forcible Entry/Detainer
☐ Foreclosure
  ☐ Commercial
  ☐ Residential
  ☐ Currency or Vehicle
  ☐ Deed of Trust
  ☐ Land Installments
  ☐ Lien
  ☐ Mortgage
  ☐ Right of Redemption
  ☐ Statement Condo
☐ Forfeiture of Property / Personal Item
☐ Fraudulent Conveyance
☐ Landlord-Tenant
☐ Lis Pendens
☐ Mechanic's Lien
☐ Ownership
☐ Partition/Sale in Lieu
☐ Quiet Title
☐ Rent Escrow
☐ Return of Seized Property
☐ Right of Redemption
☐ Tenant Holding Over

**PUBLIC LAW**
☐ Attorney Grievance
☐ Bond Forfeiture Remission
☐ Civil Rights
☐ County/Mncpl Code/Ord
☐ Election Law
☐ Eminent Domain/Condemn.
☐ Environment
☐ Error Coram Nobis
☐ Habeas Corpus
☐ Mandamus
☐ Prisoner Rights
☐ Public Info. Act Records
☐ Quarantine/Isolation
☐ Writ of Certiorari

**EMPLOYMENT**
☐ ADA
☐ Conspiracy
☐ EEO/HR
☐ FLSA
☐ FMLA
☐ Worker's Compensation
☐ Wrongful Termination

**INDEPENDENT PROCEEDINGS**
☐ Assumption of Jurisdiction
☐ Authorized Sale
☐ Attorney Appointment
☐ Body Attachment Issuance
☐ Commission Issuance

☐ Constructive Trust
☐ Contempt
☐ Deposition Notice
☐ Dist Ct Mtn Appeal
☐ Financial
☐ Grand Jury/Petit Jury
☐ Miscellaneous
☐ Perpetuate Testimony/Evidence
☐ Prod. of Documents Req.
☐ Receivership
☐ Sentence Transfer
☐ Set Aside Deed
☐ Special Adm. – Atty
☐ Subpoena Issue/Quash
☐ Trust Established
☐ Trustee Substitution/Removal
☐ Witness Appearance-Compel

**PEACE ORDER**
☐ Peace Order

**EQUITY**
☐ Declaratory Judgment
☐ Equitable Relief
☐ Injunctive Relief
☐ Mandamus

**OTHER**
☐ Accounting
☐ Friendly Suit
☐ Grantor in Possession
☐ Maryland Insurance Administration
☐ Miscellaneous
☐ Specific Transaction
☐ Structured Settlements

| IF NEW OR EXISTING CASE: RELIEF (Check All that Apply) |
|---|

| | | | |
|---|---|---|---|
| ☐ Abatement | ☐ Earnings Withholding | ☐ Judgment-Default | ☐ Reinstatement of Employment |
| ☐ Administrative Action | ☐ Enrollment | ☐ Judgment-Interest | ☐ Return of Property |
| ☐ Appointment of Receiver | ☐ Expungement | ☐ Judgment-Summary | ☐ Sale of Property |
| ☐ Arbitration | ☐ Financial Exploitation | ☐ Liability | ☐ Specific Performance |
| ☐ Asset Determination | ☐ Findings of Fact | ☐ Oral Examination | ☐ Writ-Error Coram Nobis |
| ☐ Attachment b/f Judgment | ☐ Foreclosure | ☐ Order | ☐ Writ-Execution |
| ☐ Cease & Desist Order | ☐ Injunction | ☐ Ownership of Property | ☐ Writ-Garnish Property |
| ☐ Condemn Bldg | ☐ Judgment-Affidavit | ☐ Partition of Property | ☐ Writ-Garnish Wages |
| ☐ Contempt | ☐ Judgment-Attorney Fees | ☐ Peace Order | ☐ Writ-Habeas Corpus |
| ☐ Court Costs/Fees | ☐ Judgment-Confessed | ☐ Possession | ☐ Writ-Mandamus |
| ☒ Damages-Compensatory | ☐ Judgment-Consent | ☐ Production of Records | ☐ Writ-Possession |
| ☐ Damages-Punitive | ☐ Judgment-Declaratory | ☐ Quarantine/Isolation Order | |

*If you indicated **Liability** above,* mark one of the following. This information is not an admission and may not be used for any purpose other than Track Assignment.

☐ Liability is conceded.   ☐ Liability is not conceded, but is not seriously in dispute.   ☐ Liability is seriously in dispute.

| MONETARY DAMAGES (Do not include Attorney's Fees, Interest, or Court Costs) |
|---|

☐ Under $10,000      ☐ $10,000 - $30,000      ☐ $30,000 - $100,000      ☒ Over $100,000

☐ Medical Bills $ _____      ☐ Wage Loss $ _____      ☐ Property Damages $ _____

| ALTERNATIVE DISPUTE RESOLUTION INFORMATION |
|---|

Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)

A. Mediation      ☒ Yes ☐ No                    C. Settlement Conference   ☒ Yes ☐ No
B. Arbitration    ☐ Yes ☒ No                    D. Neutral Evaluation      ☐ Yes ☒ No

| SPECIAL REQUIREMENTS |
|---|

☐ If a Spoken Language Interpreter is needed, **check here and attach form CC-DC-041**

☐ If you require an accommodation for a disability under the Americans with Disabilities Act, **check here and attach form CC-DC-049**

| ESTIMATED LENGTH OF TRIAL |
|---|

*With the exception of Baltimore County and Baltimore City, please fill in the estimated **LENGTH OF TRIAL**.*

**(Case will be tracked accordingly)**

☐ 1/2 day of trial or less          ☐ 3 days of trial time
☐ 1 day of trial time               ☒ More than 3 days of trial time
☐ 2 days of trial time

| BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM |
|---|

***For all jurisdictions,*** *if Business and Technology track designation under Md. Rule 16-308 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ **Expedited -** Trial within 7 months of          ☐ **Standard -** Trial within 18 months of
Defendant's response                                Defendant's response

EMERGENCY RELIEF REQUESTED

| COMPLEX SCIENCE AND/OR TECHNOLOGICAL CASE MANAGEMENT PROGRAM (ASTAR) |
|---|
| *FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO ASTAR RESOURCES JUDGES under Md. Rule 16-302, attach a duplicate copy of complaint and check whether assignment to an ASTAR is requested.* |
| ☐ **Expedited -** Trial within 7 months of Defendant's response    ☐ **Standard -** Trial within 18 months of Defendant's response |

*IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY OR BALTIMORE COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.*

### CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

| | |
|---|---|
| ☐ Expedited | Trial 60 to 120 days from notice. Non-jury matters. |
| ☐ Civil-Short | Trial 210 days from first answer. |
| ☐ Civil-Standard | Trial 360 days from first answer. |
| ☐ Custom | Scheduling order entered by individual judge. |
| ☐ Asbestos | Special scheduling order. |
| ☐ Lead Paint | Fill in: Birth Date of youngest plaintiff_____. |
| ☐ Tax Sale Foreclosures | Special scheduling order. |
| ☐ Mortgage Foreclosures | No scheduling order. |

### CIRCUIT COURT FOR BALTIMORE COUNTY

| | | |
|---|---|---|
| ☐ | Expedited (Trial Date-90 days) | Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus. |
| ☐ | Standard (Trial Date-240 days) | Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases. |
| ☐ | Extended Standard (Trial Date-345 days) | Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency. |
| ☐ | Complex (Trial Date-450 days) | Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases. |

| | | |
|---|---|---|
| 11/10/22 | Gregory G. Hopper | 9912150047 |
| Date | Signature of Attorney / Party | Attorney Number |
| 1829 Reisterstown Road, Suite 200 | Gregory G. Hopper | |
| Address | Printed Name | |
| Baltimore        MD        21208 | | |
| City        State        Zip Code | | |

**CC-DCM-002** (Rev. 08/2022)                    Page 3 of 3